2011 UT 53

**STATE of Utah, Plaintiff and Appellee,**

v.

**Chanzy WALKER, Defendant and Appellant.**

No. 20090150.

Supreme Court of Utah.

Aug. 30, 2011.

Mark L. Shurtleff, Att'y Gen., Jeffrey S. Gray, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Linda M. Jones, Salt Lake City, for defendant.

Paul G. Cassell, Salt Lake City, Reed M. Richards, Ogden, for amicus Utah Council on Victims of Crime.

Associate Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 In this appeal, we consider the constitutionality of a search warrant issued by a magistrate judge authorizing the police to draw blood from Appellant, Chanzy Walker. At a pretrial hearing, the district court concluded that the warrant issued by the magistrate lacked probable cause. But despite this conclusion, the district court denied a motion to suppress filed by Ms. Walker based on its determination that the good faith exception to the exclusionary rule, articulated by the United States Supreme Court in *United States v. Leon*,[1] applied in this case.

¶ 2 On appeal, Ms. Walker argues that the district court erred in concluding that there is a good faith exception to the Utah exclusionary rule. In contrast, the State contends that, even if there is not a good faith exception to the Utah exclusionary rule, we should affirm the district court's denial of Ms. Walker's motion to suppress on the alternative ground that the search warrant was supported by probable cause.

¶ 3 Based on our review of the information contained in the affidavit filed in support of probable cause, we hold that the magistrate had a substantial basis to believe that evidence of illegal conduct would be found in Ms. Walker's blood. We therefore affirm the district court's denial of Ms. Walker's motion to suppress on the alternative ground that the warrant was supported by probable cause. Because we affirm the district court's denial of Ms. Walker's motion on this ground, we do not reach the other issues Ms. Walker and the State have raised on appeal.

## BACKGROUND

¶ 4 In 2007, Ms. Walker was driving south on Bacchus Highway in Salt Lake City. As the southbound lanes merged from two lanes to one lane, Ms. Walker's vehicle crossed over the double yellow line and sideswiped a trailer being towed by a pickup truck in the northbound lane. This collision caused the trailer to "swerve wildly" and resulted in significant bodily injuries to the man towing it. After colliding with the trailer, Ms. Walker's vehicle continued south and struck, nearly head on, a second vehicle. The driver of this second vehicle was declared dead at the scene of the accident.

¶ 5 As a result of the last collision, Ms. Walker's vehicle spun out of control and eventually came to rest on the east side of the highway. Once emergency personnel arrived at the scene, Ms. Walker was transported to the hospital by helicopter.

¶ 6 Detective Mike Anderson, an accident investigator for the Salt Lake County Sheriff's Office, arrived at the scene sometime after Ms. Walker was taken to the hospital. During his investigation of the scene, Detective Anderson learned that Ms. Walker's driver license had been revoked for an alcohol violation and that she was restricted to driving vehicles with interlock ignitions.

¶ 7 As Detective Anderson continued his investigation, Detective Brett Adamson, a homicide detective, went to the hospital to interview Ms. Walker. During the interview, Detective Adamson requested that Ms. Walker submit to a blood draw, but Ms. Walker declined, stating that she thought she should speak to an attorney first. Ms. Walker also claimed she didn't remember anything. She did, however, ask several questions during the interview about the accident and the conditions of the other drivers.

¶ 8 After conducting the interview and learning of Ms. Walker's driving history from Detective Anderson, Detective Adamson suspected that Ms. Walker had been under the influence of drugs or alcohol at the time of the accident. Based on this suspicion, Detective Adamson prepared an affidavit (the Affidavit) in support of a warrant to draw and

---

1. 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

test Ms. Walker's blood. The Affidavit included the following facts:

1. "On May 24, 2007, at approximately 0633 hours the Sheriff's Office Dispatch center received a call of a traffic collision involving three vehicles in the area of 5899 S U111";

2. "[Ms.] Walker was the driver of a Ford Mustang" that was involved in the collision;

3. "Witnesses at the scene indicated [Ms. Walker] was southbound on U111 when for an *unknown* reason her vehicle crossed the center line";

4. "[Ms. Walker's] vehicle struck a trailer being towed by a vehicle northbound on U111" and "then continued south in the northbound lane striking another northbound vehicle";

5. "The driver of the second vehicle died at the scene of this collision"; "[Ms. Walker] was recovered from [her] vehicle" and "flown by medical helicopter to LDS hospital";

6. Detective Adamson "responded to L.D.S. hospital where he [spoke] with . . . [Ms.] Walker";

7. Ms. Walker "claimed she didn't remember anything about the crash," but said "she was driving . . . a mustang," which "belonged to . . . her boss," and that "she was traveling on . . . Bacchus Highway";

8. Ms. Walker "asked . . . how many cars were involved" and Det. Adamson "told her [he] had been informed that it was three"; also "[Ms. Walker] said she had heard someone died, [and] she asked if [Det. Adamson] knew anything about the victims"; Det. Adamson "told her [he] had not been to the scene";

9. Det. Adamson "asked [Ms. Walker] if she would give permission to draw blood from her for toxicology testing," but "[Ms. Walker] said she thought she should talk to a lawyer first";

10. "A check of the Utah Criminal Justice Information System revealed that [Ms. Walker's] . . . Utah Driver's License [was] revoked for alcohol . . . and that she [was] restricted to an interlock device until 2–27–2010."

Based on these facts, a magistrate judge determined that there was probable cause to believe that "[Ms.] Walker's blood consisted of or constituted evidence of illegal conduct" and issued a search warrant (the Warrant). After obtaining the Warrant, Detective Adamson returned to the hospital and obtained a blood sample from Ms. Walker. Subsequent analysis of this blood revealed the presence of methamphetamine and amphetamine.

¶ 9 Based on these test results, Ms. Walker was charged with three offenses: (1) causing the death of another by operating a motor vehicle in a negligent manner with a controlled substance in the body, a second degree felony; (2) causing serious bodily injury to another by operating a motor vehicle in a negligent manner with a controlled substance in the body, also a second degree felony; and (3) possessing a controlled substance, a third degree felony.

¶ 10 Shortly after these charges were filed against her, Ms. Walker filed a motion to suppress the results of the blood test. In support of her motion, she argued that the Affidavit "was insufficient to support a determination [by the magistrate] that probable cause existed." Additionally, she argued that the officer who executed the Warrant was not justified in relying on it and could not have believed in good faith that the search was justified by probable cause. The trial court judge agreed with Ms. Walker that the Warrant lacked probable cause. But despite this conclusion, the judge refused to grant Ms. Walker's motion to suppress after determining that the officer who conducted the search had relied on the Warrant in good faith.

¶ 11 After the district court denied her motion, Ms. Walker entered a conditional plea to causing the death of another by operating a motor vehicle in a negligent manner with a controlled substance in the body and possessing a controlled substance. Under the terms of the conditional plea, Ms. Walker reserved the right to challenge the district court's ruling on appeal as it related to the officer's reliance on the defective warrant.

She exercises this right in the instant appeal. We have jurisdiction to hear this appeal pursuant to section 78A–3–102(3)(b) of the Utah Code.

## STANDARD OF REVIEW

¶ 12 "[W]e review [a] district court's assessment of [a] magistrate's probable cause determination for correctness and ask whether the district court erred in concluding that the magistrate [did not have] a substantial basis for [his or] her probable cause determination." [2]

## ANALYSIS

I. THE MAGISTRATE HAD A SUBSTANTIAL BASIS FOR CONCLUDING THAT PROBABLE CAUSE EXISTED TO BELIEVE THAT EVIDENCE OF A CRIME WOULD BE FOUND IN MS. WALKER'S BLOOD

¶ 13 The Fourth Amendment to the United States Constitution requires that "no Warrants shall issue but, upon probable cause, supported by Oath or affirmation." [3] Accordingly, to obtain a warrant, police officers are required to go before a fair and impartial magistrate, who is tasked with determining whether a warrant request is supported by probable cause. "Where a search warrant supported by an affidavit is challenged as having been issued *without* an adequate showing of probable cause, our review focuses on the magistrate's probable cause determination." [4] In conducting this review, "we assess whether the magistrate had a substantial basis for determining that probable cause existed." [5] In making this determination, "[w]e afford the magistrate's decision great deference and consider the affidavit relied upon by the magistrate in its entirety and in a common sense fashion." [6] On appeal, we affirm a magistrate's finding of probable cause based upon an affidavit only where the affidavit supports the magistrate's determination that there is probable cause to believe "that evidence of [a] crime will be found in the place or places named in the warrant." [7]

¶ 14 In relevant part, the Affidavit submitted to the magistrate in this case contained the following information: (1) Ms. Walker's vehicle "crossed the center line" for "an unknown reason"; (2) after crossing the center line, Ms. Walker's vehicle struck two other vehicles, causing serious injury to the driver of one of the vehicles and the death of the driver of the other vehicle; (3) when Detective Adamson asked Ms. Walker about the crash, she responded that she "didn't remember anything"; (4) a check of the Utah Criminal Justice Information System revealed that Ms. Walker's driver license had been "revoked for alcohol" and that she was restricted to an interlock device until February 27, 2010; and (5) at the time of the accident, Ms. Walker was driving a vehicle owned by her boss.

¶ 15 Interpreting these facts in a practical, commonsense fashion, in light of the totality of the circumstances, and with deference to the issuing magistrate, we conclude that the district court erred in concluding that the magistrate lacked a substantial basis for his finding of probable cause. After reviewing the facts contained in the Affidavit, the magistrate was aware that Ms. Walker had some history of driving under the influence of alcohol and that, as a result of this history, her license was currently suspended and she was currently restricted to an interlock device. These facts alone may not have been sufficient to support a finding of probable cause.[8] But with the additional facts that Ms. Walk-

---

2. *State v. Norris,* 2001 UT 104, ¶ 14 n. 2, 48 P.3d 872.

3. U.S. Const. amend. IV.

4. *State v. Norris,* 2001 UT 104, ¶ 14, 48 P.3d 872 (emphasis added).

5. *Id.* (internal quotation marks omitted).

6. *Id.* (internal quotation marks omitted).

7. *Id.* (internal quotation marks omitted).

8. *See, e.g., Burrell v. McIlroy,* 464 F.3d 853, 858 n. 3 (9th Cir.2006) ("Although a prior criminal history cannot alone establish ... probable cause ... it is permissible to consider such a fact as part of the total calculus of information in [making such a] determination[ ].").

er's vehicle had crossed over the center line for an "unknown reason," that Ms. Walker could not remember the details of the accident, and that Ms. Walker was driving a vehicle owned by her boss, which presumably did not contain an interlock device,[9] the magistrate had a substantial basis to believe that evidence of a crime was likely to be found in Ms. Walker's blood.

¶ 16 Ms. Walker argues that the crossing of her vehicle over the center line "could have been [caused] by a mechanical problem, driver inattention, a cell phone call, or any number of reasons unrelated to alcohol impairment." But when making a probable cause determination, a magistrate is not required to eliminate all possible innocent explanations for conduct or evidence.[10] Rather, a magistrate is tasked with reviewing the facts contained in an affidavit in a common-sense fashion. And as previously stated, viewing the facts contained in the Affidavit in such a fashion could lead one to reasonably believe that Ms. Walker was under the influence of alcohol at the time of the accident.

¶ 17 In sum, based on our review of the facts contained in the Affidavit, we conclude that the magistrate had a substantial basis to believe that evidence of a crime would be found in Ms. Walker's blood. We therefore hold that the Warrant authorizing the police to draw Ms. Walker's blood was supported by probable cause.

## CONCLUSION

¶ 18 Viewing the facts contained in the Affidavit in a practical, commonsense fashion, in light of the totality of the circumstances, and with deference to the issuing magistrate, we conclude that the magistrate had a substantial basis to believe that evidence of a crime would be found in Ms. Walker's blood. We therefore affirm the district court's denial of Ms. Walker's motion to suppress on the alternative ground that the Warrant used to draw her blood was supported by probable cause.

¶ 19 Chief Justice DURHAM and Justice PARRISH concur in Associate Chief Justice DURRANT's opinion.

Justice NEHRING, concurring:

¶ 20 Like Justice Lee, I concur in Associate Chief Justice Durrant's excellent opinion for the court. The magistrate in this case had probable cause to issue a warrant authorizing the acquisition of Ms. Walker's blood sample. And like Justice Lee, I agree that we ought to affirm on that narrow basis.[1]

¶ 21 I write separately in this case to respectfully express my disapproval of Justice Lee's decision to write at length on a topic that does not affect the resolution of this case. Like all of my colleagues, I disagree with many judicial opinions. I have even come to take issue with opinions I have authored for the court. But I also believe that giving voice to those opinions should be reserved for an occasion where the issues presented are properly before the court.[2] This is not one of those occasions.

9. The Affidavit submitted to the magistrate did not expressly state that Ms. Walker was not driving a vehicle with an interlock device. But the Affidavit did state that at the time of the accident, Ms. Walker was driving her bosses' vehicle. Because Ms. Walker did not own this vehicle, we believe a fair inference can be drawn that the vehicle did not contain an interlock device.

10. *See, e.g., State v. Poole*, 871 P.2d 531, 535 (Utah 1994) ("Although there might be innocent explanations for particular conduct, it is not necessary that all legitimate reasons be absent before ... find[ing] probable cause.").

1. *See Gallivan v. Walker*, 2002 UT 89, ¶ 97, 54 P.3d 1069 (Durham, C.J., concurring) ("[C]ourts should generally resolve cases on the *narrowest applicable grounds* unless specific reasons exist for offering broader guidance." (emphasis added)).

2. *See Clegg v. Wasatch Cnty.*, 2010 UT 5, ¶ 26, 227 P.3d 1243 ("Indeed, where any direction we may provide ... may ultimately prove to be irrelevant, or where there are possible circumstances under which we would not need to address [a constitutional claim], to do so would be to impermissibly render an advisory opinion." (first alteration in original) (citation and internal quotation marks omitted)); *Summit Water Distrib. Co. v. Summit Cnty.*, 2005 UT 73, ¶ 50, 123 P.3d 437 ("Our settled policy is to avoid giving advisory opinions in regard to issues unnecessary to the resolution of the claims before us."); *Utah Safe to Learn–Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶ 19, 94 P.3d 217 (" 'The courts are not a forum for hearing academic contentions or

¶ 22 I agree with Justice Lee that in some circumstances, it is appropriate for an appellate court to address nondispositive issues in a case to give guidance to the lower court regarding further proceedings on remand.[3] Under rule 30(a) of the Utah Rules of Appellate Procedure, this type of guidance is expressly permitted, and allows our court to "pass upon and determine all questions of law involved in the case presented upon the appeal and *necessary to the final determination of the case.*"[4] But in this case, the trial court needs no such guidance on remand. This court unanimously concludes that the officer conducted a reasonable search,[5] and therefore the trial court has all the information necessary to resolve the case and needs no direction on the issue of exclusion.

¶ 23 I also disagree with Justice Lee's characterization of his opinion as an "alternative ground"[6] for resolving this appeal. Although it is true that "[t]his case presents two constitutional questions of equal dignity,"[7] it is also true that these constitutional issues are sequential, and contrary to Justice Lee's statement, one question *does* take priority over the other. Indeed, if the court unanimously concludes, as it has in this case, that there was probable cause for a search, then the second constitutional question of what the remedy would be if the search were conducted without probable cause becomes merely hypothetical. To reach the second question, Justice Lee must assume *there was no probable cause for the search,* which is inconsistent with the court's unanimous holding in this case. Thus, instead of an "alternative ground" for affirmance, Justice Lee's concurring opinion is simply a commentary on his preferred resolution of a set of facts different from those presented by this case.

¶ 24 Let me be clear, I do not fault Justice Lee for using his concurring opinion as a vehicle for communicating his strongly held views about whether the Utah Constitution contemplates an exclusionary rule as a remedy for violations of article I, section 14. I note only that I disagree with his choice to voice this view in a case where we unanimously conclude that probable cause existed for the search. In cases where we conclude that probable cause exists, we typically decline to address the constitutional arguments brought by the parties, even when fully briefed and argued before the court.[8] I see no reason to depart from this practice in the present case.

¶ 25 The issue of whether the Utah Constitution contemplates an exclusionary rule is a controversial one. I have no doubt it will come before the court again, and that, when it does, Justice Lee will express a strong opinion about it. I also have strong opinions

---

rendering advisory opinions.' " (quoting *Baird v. State,* 574 P.2d 713, 715 (Utah 1978))); *Gallivan,* 2002 UT 89, ¶ 97, 54 P.3d 1069 (Durham, C.J., concurring) ("[C]ourts should generally resolve cases on the narrowest applicable grounds unless specific reasons exist for offering broader guidance."); *Olson v. Salt Lake City Sch. Dist.,* 724 P.2d 960, 962 n. 1 (Utah 1986) ("This Court will not issue advisory opinions."); *Justheim v. Div. of State Lands,* 659 P.2d 1075, 1077 (Utah 1983) ("It is not our function to render advisory opinions."); *Hoyle v. Monson,* 606 P.2d 240, 242 (Utah 1980) ("[C]ourts do not busy themselves with advisory opinions."); *Koer v. Mayfair Mkts.,* 19 Utah 2d 339, 431 P.2d 566, 571 (1967) ("We adhere to our policy not to render advisory opinions as to requests irrelevant and immaterial to the issues on appeal."); *State v. Kallas,* 97 Utah 492, 94 P.2d 414, 424 (1939) (refusing to address the constitutionality of a statute where it was not determinative of the party's rights); *see also Spector Motor Serv., Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudi-

cation, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.").

3. *See infra* ¶ 62 & n.19.

4. UTAH R. APP. P. 30(a) (emphasis added).

5. *See supra* ¶ 17.

6. *See infra* ¶ 28.

7. *See infra* ¶ 62.

8. *See, e.g., State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985) ("In light of our determination that there was sufficient probable cause to issue the search warrant and that the search was properly undertaken, we need not reach the constitutional issue."); *see also State v. Thurman,* 846 P.2d 1256, 1262 (Utah 1993) ("[J]udicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (internal quotation marks omitted)).

on this subject, but unlike Justice Lee, I believe we should save this conversation for another day—for a case where there is an actual violation of article I, section 14 and it is thus necessary and appropriate to engage in this analysis.

¶ 26 Chief Justice DURHAM and Justice PARRISH concur in Justice NEHRING's concurring opinion.

Justice LEE, concurring:

¶ 27 I concur in Justice Durrant's excellent opinion for the court. As that opinion demonstrates, the magistrate had a substantial basis for concluding that probable cause existed to draw and test Chanzy Walker's blood. That is an appropriate ground for affirming Walker's conviction, and I agree with the court's decision to affirm on that basis.

¶ 28 I write separately, however, to articulate an alternative ground for affirmance on an important issue of state constitutional law. The issue is whether article I, section 14 of the Utah Constitution contemplates an exclusionary rule as a remedy for its violation. This court's recent jurisprudence suggests that it does. *See State v. Larocco*, 794 P.2d 460, 471–73 (Utah 1990) (plurality opinion); *State v. Thompson*, 810 P.2d 415, 419 (Utah

1991) (adopting the *Larocco* plurality without discussion or analysis). Yet these decisions enshrine this sweeping remedy without any consideration of the original meaning of the constitutional provision in question. They also casually cast aside settled, longstanding precedents of this court that held the contrary. *See State v. Aime*, 62 Utah 476, 220 P. 704, 705 (1923); *see also State v. Fair*, 10 Utah 2d 365, 353 P.2d 615, 615 (1960). My own review of the text and history of article I, section 14 leads me to disagree with our recent case law on this issue. In my view, Utah's constitution as originally understood did not contemplate the remedy of exclusion in the event of an illegal search or seizure. Thus, I would also affirm the decision in this case on the alternative ground that there is no exclusionary rule under the Utah Constitution. I think *Larocco* and *Thompson* should be overruled, and I would do so in this case.

I

¶ 29 It should go without saying that our construction of a provision of the constitution must rest on the original meaning of the constitutional text. Originalism is more than just "the dominant form of constitutional interpretation during most of our nation's history." [1] It is a theory that is essential to any system of government that finds its legitima-

1. OFFICE OF LEGAL POLICY, U.S. DEP'T OF JUSTICE, REPORT TO THE ATTORNEY GENERAL, ORIGINAL MEANING JURISPRUDENCE: A SOURCEBOOK at I (1987); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174–75, 178, 2 L.Ed. 60 (1803) (applying "the plain import of the words" of the constitution and adhering "to their obvious meaning," while rejecting textual interpretations that would render any clause "mere surplusage" or that would require courts to "close their eyes on the constitution"); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 137, 3 L.Ed. 162 (1810) (analyzing the original meaning of the contract clause in article I, section 10 and concluding that the clause applies to executed contracts because "the constitution uses the general term contract, without distinguishing between those which are executory and those which are executed," and thus "must be construed to comprehend the latter as well as the former"); *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 326, 4 L.Ed. 97 (1816) (insisting that the constitution, "like every other grant [of powers], is to have a reasonable construction, according to the import of its terms," and stating that "[t]he words are to be taken in their natural and obvious sense, and not in a sense unreasonably restricted or enlarged"); *Cohens v. Virginia*,

19 U.S. (6 Wheat.) 264, 377, 422, 5 L.Ed. 257 (1821) (deferring to original meaning—"[i]f such be the constitution, it is the duty of the Court to bow with respectful submission to its provisions"—and rejecting the interpretation proposed by the State of Virginia as "founded, not on the words of the constitution, but on its spirit, a spirit extracted, not from the words of the instrument, but from [counsel's] view of the nature of our Union, and of the great fundamental principles on which the fabric stands"); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 332, 6 L.Ed. 606 (1827) (Marshall, C.J., dissenting) ("To say that the intention of the instrument must prevail; that this intention must be collected from its words; that its words are to be understood in that sense in which they are generally used by those for whom the instrument was intended; that its provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them nor contemplated by its framers; is to repeat what has been already said more at large, and is all that can be necessary."); *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 539, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944) ("Ordinarily courts do not construe words used

cy in the will of the people as expressed in positive laws enacted by their representatives.[2] Such systems rightly presume that the rules of law adopted by our representatives remain in force and are worthy of respect until they are repealed or amended by the due processes designated for that purpose.[3]

¶ 30 For statutes, the original meaning of the law as enacted by the legislature may be changed only by new legislation produced through bicameralism and presentment.[4] The constitution is even more insulated from change. Its provisions may be altered only by amendments adopted through the supermajoritarian procedures set forth in its provisions.[5] The barriers to amendment of our laws are by design. Members of the public are entitled to rely on and organize their affairs around the law as positively enacted—unless and until the law is amended or repealed.

¶ 31 With a notable exception, the accepted processes for amending our laws do not include judicial reconsideration or adaptation of the law by our judges, who are the least accountable of our government officials. For the most part, the role of modern judges is to interpret the law, not to repeal or amend it, and then to apply it to the facts of the cases that come before them.[6] The process of interpretation, moreover, involves the judge in an exercise that implicates not the judge's own view of what the law should be, but instead a determination of what the law is as handed down by the legislature or framers of

in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written.").

2. J. Story, Commentaries on the Constitution of the United States § 406 ("Nothing but the text itself was adopted by the people. And it would certainly be a most extravagant doctrine to give to any commentary then made, and *à fortiori*, to any commentary since made, under a very different posture of feeling and opinion, an authority which should operate as an absolute limit upon the text, or should supersede its natural and just interpretation.").

3. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 451, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (Sutherland, J., dissenting) ("'[I]t may easily happen' ... 'that specific provisions may, in unforeseen emergencies, turn out to have been inexpedient. This does not make these provisions any less binding. Constitutions can not [sic] be changed by events alone. They remain binding as the acts of the people in their sovereign capacity, as the framers of Government, until they are amended or abrogated by the action prescribed by the authority which created them. It is not competent for any department of the Government to change a constitution, or declare it changed, simply because it appears ill adapted to a new state of things.'" (quoting *People ex rel. Twitchell v. Blodgett*, 13 Mich. 127, 139–40 (1865))).

4. Utah Const. art. VII, § 8, cl. 1 ("Each bill passed by the Legislature, before it becomes a law, shall be presented to the governor. If the bill is approved, the governor shall sign it, and thereupon it shall become a law.").

5. U.S. Const. art. V ("The Congress, whenever two-thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two-thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three-fourths of the several States, or by Conventions in three-fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress...."); Utah Const. art. XXIII, § 1 ("Any amendment or amendments to this Constitution may be proposed in either house of the Legislature, and if two-thirds of all the members elected to each of the two houses, shall vote in favor thereof, such proposed amendment or amendments shall be entered on their respective journals with the yeas and nays taken thereon; and the Legislature shall cause the same to be published in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election, at which time the said amendment or amendments shall be submitted to the electors of the state for their approval or rejection, and if a majority of the electors voting thereon shall approve the same, such amendment or amendments shall become part of this Constitution.").

6. *See Ritchie v. Richards*, 14 Utah 345, 47 P. 670, 675 (1896) (Batch, J., concurring in the result) ("The power to declare what the law shall be is legislative. The power to declare what is the law is judicial."); *see also* Utah Const. art. V ("The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.").

the constitution. The judge, in other words, is not a primary lawgiver but instead an agent for the legislature or framer that played that role.[7] This allocation of power again is deliberate. The more politically accountable bodies of government make new laws; judges, who are more insulated from political processes, simply interpret them and attempt to apply them in an objective, even-handed manner.[8]

7. See *Mulcahy v. Pub. Serv. Comm'n*, 101 Utah 245, 117 P.2d 298, 302 (1941) ("The legislative function is the enactment of laws, that is, the creation of legal rights, liabilities, and remedies."); *Brown v. Wightman*, 47 Utah 31, 151 P. 366, 367 (1915) ("The right and power, as well as the duty, of creating rights and to provide remedies, lies with the Legislature, and not with the courts. Courts can only protect and enforce existing rights, and they may do that only in accordance with established and known remedies.").

8. *State v. Atkinson*, 298 Or. 1, 688 P.2d 832, 835 (1984) ("Like the Supreme Court of the United States, we are a judicial, not a legislative body. It is not our function to decide [policy]. That is a matter for politically accountable officials to decide by laws, ordinances, or delegations of rule-making authority."); THE FEDERALIST No. 47 (James Madison) ("Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator."); THE FEDERALIST No. 81 (Alexander Hamilton) ("From a body which had even a partial agency in passing bad laws, we could rarely expect a disposition to temper and moderate them in the application. The same spirit which had operated in making them, would be too apt in interpreting them; still less could it be expected that men who had infringed the Constitution in the character of legislators, would be disposed to repair the breach in the character of judges. Nor is this all. Every reason which recommends the tenure of good behavior for judicial offices, militates against placing the judiciary power, in the last resort, in a body composed of men chosen for a limited period. There is an absurdity in referring the determination of causes, in the first instance, to judges of permanent standing; in the last, to those of a temporary and mutable constitution. And there is a still greater absurdity in subjecting the decisions of men, selected for their knowledge of the laws, acquired by long and laborious study, to the revision and control of men who, for want of the same advantage, cannot be deficient in that knowledge. The members of the legislature will rarely be chosen with a view to those qualifications which fit men for the stations of judges; and as, on this account, there will be great reason to apprehend all the ill consequences of defective information, so, on account of the natural propensity of such bodies

¶ 32 All of this underscores the crucial importance of the judicial inquiry into original meaning. A judge who assumes the role of secondary interpreter of the law must stick to the original meaning of the text of the law as handed down by the lawgiver. If and when he substitutes his own views for that of the original lawgiver, he has exceeded the proper bounds of his judicial office.[9]

to party divisions, there will be no less reason to fear that the pestilential breath of faction may poison the fountains of justice. The habit of being continually marshaled on opposite sides will be too apt to stifle the voice both of law and of equity.").

9. In recent years, this court has rightly expressed its commitment to an originalist method of constitutional interpretation. See *Am. Bush v. City of S. Salt Lake*, 2006 UT 40, ¶ 12, 140 P.3d 1235 (indicating that "in interpreting the Utah Constitution, prior case law guides us to analyze its text, historical evidence of the state of the law when it was drafted, and Utah's particular traditions at the time of drafting," in order "to discern the intent and purpose of both the drafters of our constitution and ... the citizens who voted it into effect"). The adoption of that method, in my view, should properly have put to rest earlier assertions by this court of the judicial prerogative to shape the constitution in accordance with our view of " 'sister state law[ ] and policy arguments in the form of economic and sociological materials.' " *State v. Gardner*, 947 P.2d 630, 633 (Utah 1997) (plurality opinion) (quoting *Soc'y of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 921 n. 6 (Utah 1993)). Yet this court's commitment to an originalist methodology has been inconsistent, with recent opinions purporting to revive the notion of judicial recourse to "sister state law" and "policy arguments" in constitutional analysis while seeming to relegate originalist interpretation to a secondary status—"persuasive in some cases" but not "represent[ing] a *sine qua non* in constitutional analysis." See *State v. Tiedemann*, 2007 UT 49, ¶ 37, 162 P.3d 1106 (citing *Gardner* and *Soc'y of Separationists* ).

This latter approach strikes me as incompatible with a commitment to a passive judicial role in interpreting the law as enacted by the people or their representatives. I understand that an informed, engaged judge may prefer the freedom to inject his views into the law under the guise of judicial review. But a decision to start down that path is a decision to abandon the judicial role. We cannot maintain our commitment to judicial interpretation of the law while retaining the notion of active consideration of social policy in our decisions. The only social policy that matters is the one embraced in the legislation or constitutional provision we are interpreting. We

¶ 33 The above-noted exception is important. On matters of common law, our system has opted to leave primary lawmaking in the hands of the judiciary. Historically, the domain of the common law was vast, and common-law judges properly assumed the role of lawgiver on a wide range of issues encompassing both criminal cases and civil cases in fields of tort, contract, and property. Today, most all of the traditional common-law fields are occupied to a large degree by legislation, making the modern judge's common-law domain narrow and interstitial.[10] In the remaining fields left to common-law decision-making, a judge may appropriately prioritize his own view of what the law should be ahead of his understanding of how the law originally was understood when it was first handed down. But that is because in those fields our system of government has vested primary lawmaking in the judge's hands.

¶ 34 In other fields where the common law has been displaced by legislative code or constitutional provisions, a judge's view of the law's original meaning takes on a fundamentally different role. Where the judge's primary lawmaking authority has been usurped by legislative or constitutional enactments, he cannot ignore the original meaning of the law without exceeding the bounds of his judicial authority as a secondary interpreter and not a primary lawgiver. Thus, on most questions facing the modern judge, originalism is not just a wise starting point; it is the beginning and end of the judge's function, and an essential limitation on judicial power.

¶ 35 This limitation is most important on matters of constitutional law. Our state and federal constitutions are not just supreme; they are organic or constitutive, in that they establish the fundamental ground rules for lawmaking and fixed bulwarks against potential tyrannies of the majority. The provisions of these founding documents "form[ ] the fundamental and paramount law of the nation," establishing "certain limits not to be transcended" and "designed to be permanent." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 178, 2 L.Ed. 60 (1803). "The exercise of this original right is a very great exertion" that ought not "be frequently repeated," *id.* at 176, least of all by judicial fiat.

¶ 36 Thoughtful judges might understandably bristle at these restraints on their authority. Capable people don't like to be told that their views don't matter, or that their role is merely to implement someone else's policies. A judge on a court of last resort (like this one) may be especially prone to object to such a limited conception of his role, since his court has the final say in interpreting the law in his jurisdiction.

¶ 37 But the luxury of having the final say does not erase the necessity of assuring the propriety of our exercise of judicial power. Justice Robert Jackson's words are an appropriate reminder: "We are not final because we are infallible, but we are infallible only because we are final." *Brown v. Allen,* 344 U.S. 443, 540, 73 S.Ct. 397, 97 L.Ed. 469 (1953) (Jackson, J., concurring). The obviously constructive nature of our "infallibility" is an important reminder of our obligation to constantly limit the sphere of our decision-making to the role that we are afforded under the constitution.

¶ 38 We fall short of that solemn duty when we "interpret" the law without attempting to determine its original meaning.[11]

---

should categorically repudiate our precedents that suggest otherwise—that treat the original meaning of the law as merely one of several "persuasive" grounds for judicial construction and that open the door to any "sister state law" or good "policy" that we deem relevant—and hold consistently to the view that our statutes and constitution mean what they meant when they were originally enacted until repealed or amended by the political branches of government.

**10.** *See* Ernest Bruncken, *The Common Law and Statutes,* 29 YALE L.J. 516, 516 (1920) ("The most fundamental phenomenon in the legal history of the countries living under the common law, during the last one hundred years . . . is found in the gradual substitution, still going on, of statutory for customary rules in private law.").

**11.** The structural basis for originalism does not naively assume that original meaning will always be easily determinable by objective evidence. Indeed, "it is often exceedingly difficult to plumb the original understanding of an ancient text." Antonin Scalia, *Originalism: The Lesser Evil,* 57 U. CIN. L.REV 849, 856 (1989). But the recognition that the evidence may sometimes be difficult

When we instead simply announce the law as we would have it be, we exceed the proper bounds of our judicial power.

¶ 39 This court's decisions in *Larocco* and *Thompson* appear to me to fall short under these standards. Despite decades-old precedents holding that article I, section 14 of our constitution did not incorporate a remedy of exclusion, a plurality in *Larocco* expressed the inclination of two members of this court to adopt such a rule. And although the *Larocco* plurality made no attempt to identify the original meaning of that provision of the constitution or to distinguish or overrule our prior precedents to the contrary, a majority in *Thompson* casually embraced the *Larocco* plurality position as the law of this state. For reasons elaborated below, I think we should reconsider the position identified in *Larocco* and adopted in *Thompson*.

### A

¶ 40 Until relatively recently, this court had long declined to find an exclusionary remedy in the provisions of article I, section 14. The court's first pronouncement on this issue was its decision in *State v. Aime*, where we unanimously held that "the admissibility of evidence is not affected by the illegality of the means through which it has been obtained." 62 Utah 476, 220 P. 704, 708 (1923). This holding was reaffirmed in *State v. Fair*, where we concluded that "[i]t is not necessary to determine whether or not the search was legal, because this court has previously held that evidence, even though illegally obtained, is admissible." 10 Utah 2d 365, 353 P.2d 615, 615 (1960) (citing *Aime*, 220 P. 704).

¶ 41 Our decision in *Fair* was eclipsed and largely preempted by the United States Supreme Court's decision a year later in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). *Mapp* held for the first time that the United States Constitution required exclusion in state court of evidence seized in violation of the Fourth Amendment. *Id.* at 665, 81 S.Ct. 1684. Our decisions following *Mapp* necessarily acquiesced in the

federal exclusionary rule. *See State v. Louden*, 15 Utah 2d 64, 387 P.2d 240, 241–42 (1963) (indicating "no disposition to disagree with the doctrine that where police officers have obtained evidence by illegal methods, such as unlawful search in violation of the [Fourth] Amendment to the United States Constitution and Article I, Sec[tion] 14 of our Constitution, it should not be used to convict a person of crime, as held by the United States Supreme Court in the case of *Mapp v. Ohio* "). For several decades, however, this court "never separately articulated an exclusionary rule as a necessary part of article I, section 14," but instead simply handed down "a series of cases ... approv[ing] the federal rule and afford[ing] its protections to Utah citizens." *Larocco*, 794 P.2d at 471.

¶ 42 That all changed in *Larocco*. In that case, a two-justice plurality acknowledged the above-described state of this court's exclusionary rule cases but nonetheless proceeded to reverse course on the issue. The *Larocco* plurality's justification for jettisoning *Aime* and *Fair* had nothing to do with a reevaluation of the text of article I, section 14 as understood at the time of the framing of the Utah Constitution. In fact, the *Larocco* plurality made no reference to the text, history, or original meaning of that provision in support of its adoption of a Utah exclusionary rule. Instead, the plurality simply deemed it "useful to examine opinions from other state courts"—opinions indicating a trend of "[a]t least eighteen states" that had "adopted an independent state constitutional exclusionary rule." *Id.* at 472, 794 P.2d 460. Significantly, none of the cited cases predated the adoption of the Utah Constitution, and the plurality failed to explain how these later interpretations of the constitutions of other states were relevant to understanding the meaning of article I, section 14.

¶ 43 Thus, the *Larocco* plurality was simply jumping on what it perceived as the state exclusionary rule bandwagon. In claiming an independent Utah exclusionary rule, the *Larocco* plurality seemed to treat this impor-

---

to interpret does not excuse a failure to even look at it. A judge's intuitive sense of justice or equity obviously comes into play at some stage of the interpretive process; it cannot, however, com-

pletely displace the judge's principal responsibility to implement the law as intended and expressed by the primary lawgiver.

tant constitutional question as if it were a common-law matter—an issue within the court's prerogative to amend and adapt at will in light of jurisprudential trends in other jurisdictions. Indeed, the *Larocco* plurality accepted the existence of the exclusionary rule as a foregone conclusion, suggesting that the "significant questions which must be answered by state courts considering independent state exclusionary rules" concern the nature and scope of the rule. *Id.* at 473, 794 P.2d 460.

¶ 44 The exclusionary rule accepted by a plurality in *Larocco* was embraced by a majority of the court in *State v. Thompson.* The *Thompson* court's holding on this issue was even more cursory. *Thompson* failed to cite *Aime* or *Fair* and again made no reference to the text or original meaning of section 14. Instead the court simply quoted *Larocco* for the purportedly uncontroversial proposition that "'exclusion of illegally obtained evidence is a necessary consequence of police violations of article I, section 14.'" 810 P.2d at 419 (alteration omitted) (quoting *Larocco,* 794 P.2d at 472).

¶ 45 *Thompson* thus relied on the *Larocco* plurality for the existence of a Utah exclusionary rule without acknowledging that the *Larocco* rule had never commanded a majority and without any discussion of the court's contrary precedent or of the history and text of article I, section 14. None of our subsequent decisions offers any further analysis of this issue.

¶ 46 Thus, although this court has embraced an independent state exclusionary rule for the past couple of decades, it has done so without ever considering the original meaning of the constitutional provision in question. Given the importance of this issue and the absence of any careful analysis in this court's cases, I would be inclined to

reconsider the rule in *Larocco* and *Thompson* in an appropriate case.

B

¶ 47 When this court does consider the text and history of article I, section 14, it should hold that this provision does not incorporate the sweeping remedy of an exclusionary rule. That section provides as follows:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

UTAH CONST. art. I, § 14. This language simply provides a guarantee of security against unreasonable searches and seizures and a prohibition on warrants without probable cause. It says nothing about an exclusionary—or any other—remedy for the violation of its provisions.

¶ 48 The absence of any textual reference to a remedy shifts the focus to the historical context of this provision. If section 14 was adopted in a legal environment in which unlawfully seized evidence was deemed inadmissible in court, it would be appropriate to interpret that provision to incorporate an exclusionary rule.[12] If not, this court should not constitutionalize such a remedy no matter how prudent or fashionable we might now find it to be.

¶ 49 In my view, the historical record points decidedly against the conclusion that section 14 would have been understood in its historical context to call for an exclusionary remedy. That remedy, in fact, was virtually unknown at that time. When the Utah Constitution was ratified, no appellate court *in any state* had excluded unlawfully obtained evidence under its constitution.[13] The com-

---

12. *See Am. Bush v. City of S. Salt Lake,* 2006 UT 40, ¶ 10, 140 P.3d 1235 (we "inform our textual interpretation with historical evidence" which helps us understand the text's meaning); *see also State v. Betensen,* 14 Utah 2d 121, 378 P.2d 669, 669 (1963) ("[I]t is proper to look not only to the [constitution] itself, but to the background out of which it arose....").

13. *See* Paul G. Cassell, *The Mysterious Creation of Search and Seizure Exclusionary Rules Under State Constitutions: The Utah Example,* 1993 UTAH L.REV. 751, 803; *see also* Lester J. Mazor, *Notes on a Bill of Rights in a State Constitution,* 1966 UTAH L.REV. 326, 346 (noting that the federal exclusionary rule did not have "an antecedent in the language of a single state constitution,

mon law record is similar. Under the common law in the late twentieth century, illegally obtained evidence was nearly always admissible in court.[14] Instead, a citizen wronged by an illegal search could sue the wrongdoers for the tort of trespass. Anyone who invaded another's property was guilty of trespass and had to pay damages, unless the intruder had some positive legal authority such as a valid warrant.[15]

¶ 50 In 1904, shortly after the Utah Constitution was ratified, the United State Supreme Court surveyed the common law on admissibility of illegally seized evidence in a number of jurisdictions. *See Adams v. New York,* 192 U.S. 585, 24 S.Ct. 372, 48 L.Ed. 575 (1904). The *Adams* court noted that the general rule was that "[e]vidence which is pertinent to [an] issue is admissible, although it may have been procured in an irregular[,] or even in an illegal[,] manner." *Id.* at 596, 24 S.Ct. 372 (internal quotation marks omitted). The court explained that this rule had been upheld in "the English, and nearly all of the American cases." *Id.* at 598, 24 S.Ct. 372.

¶ 51 In the face of this extensive historical record, Walker's briefs in this case cite one historical data point purportedly to the contrary: the United States Supreme Court's decision in *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). It is true that *Boyd* excluded evidence obtained through an improper subpoena in a civil forfeiture case. But the decision provides no basis for attributing to the Utah framers an intent to adopt a broad exclusionary remedy for search-and-seizure violations under section 14.

¶ 52 *Boyd* was a narrow anomaly in nineteenth-century jurisprudence on the admissibility of illegally obtained testimonial evidence. The government in *Boyd* had initiated a forfeiture proceeding against two businessmen for importing (smuggling) dozens of cases of plate glass in violation of federal import and revenue laws. *Id.* at 617–18, 6 S.Ct. 524. During the civil forfeiture trial, the government sought discovery of invoices for the goods in order to prove their quantity and value. *Id.* at 618, 6 S.Ct. 524. The government served the defendants with a subpoena declaring that if they did not produce the invoices, "the allegations which it is affirmed they will prove shall be taken as confessed." *Id.* at 621, 6 S.Ct. 524. The defendants grudgingly produced the requested documents, but following a verdict for the government, they appealed on the grounds that the compelled production of the invoices violated their constitutional rights under the Fourth and Fifth Amendments. *Id.* at 618, 6 S.Ct. 524.

¶ 53 *Boyd* was a civil (not a criminal) case,[16] it involved no police, and no search or seizure ever took place. Although it appears there was thus no Fourth Amendment search or seizure in *Boyd,* the court concluded that the compulsory production of private papers fell within the scope of the Fourth Amendment because it "effect[ed] the sole object and purpose of [a] search and seizure." *Id.* at 622, 6 S.Ct. 524. Noting the "intimate relation" between the Fourth and Fifth Amendments,[17] the court then combined those amendments to inject the notion of exclusion into the case. *Id.* at 633, 6 S.Ct. 524. Seizing the defendants' private invoices (their private "books and papers"), according to the court, was substantially the equivalent of compelling them to give the testimony contained in the papers. *Id.* at 633–35, 6

---

either as a result of amendment or the adoption of a new constitution").

**14.** *See, e.g.,* Annotation, *Admissibility of Evidence Obtained by Illegal Search and Seizure,* 24 A.L.R. 1408 (1923) (showing that no state court had held that improperly seized evidence was inadmissible prior to the adoption of the Utah Constitution).

**15.** *See* Albert J. Harno, *Evidence Obtained by Illegal Search and Seizure,* 19 ILL. L. REV. 303, 307

(1925) (asserting that the Fourth Amendment "merely guaranties that the injured person shall not be denied a cause of action against the trespasser").

**16.** The court described the proceedings as "civil in form, [but] in their nature criminal." *Id.* at 634, 6 S.Ct. 524.

**17.** *See also id.* at 630, 6 S.Ct. 524 (noting that the Fourth and Fifth Amendments "run almost into each other").

S.Ct. 524. The court concluded that to admit into evidence in a civil proceeding papers that had been acquired through an illegal search and seizure would constitute a second and independent violation of the Constitution—a violation of the Fifth Amendment's guarantee against compulsory self-incrimination. *Id.* at 634–35, 6 S.Ct. 524.

¶ 54 Although *Boyd* is sometimes cited as the seedbed of the modern exclusionary rule, that decision does not sustain this construction. Instead of recognizing an exclusionary rule under the Fourth Amendment, as was later done in *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), *Boyd* cobbled together a unique, hybrid rule using the Fourth and Fifth Amendments to exclude certain testimonial evidence under the theory that to admit illegally seized papers and books would violate the Fifth Amendment—an amendment meant to protect a defendant's rights at trial. *See Boyd,* 116 U.S. at 619–20, 632–38, 6 S.Ct. 524.[18]

¶ 55 The narrow limits of *Boyd* were explained by the United States Supreme Court in *Adams v. New York. See* 192 U.S. at 596–98, 24 S.Ct. 372. In *Adams,* the defendant sought to exclude improperly seized evidence on the basis of *Boyd. See id.* at 596–97, 24 S.Ct. 372. But the *Adams* court distinguished *Boyd* and allowed the illegally obtained evidence to be admitted, noting that the statute at issue in *Boyd* was unique because it required the defendant to either produce his books or records or "the allegation of the government's attorney as to their contents [would] be taken as true." *Id.* at 597, 24 S.Ct. 372. Consequently, the unique statute "virtually compelled the defendant to furnish testimony against himself in a suit to forfeit his estate." *Id.* at 598, 24 S.Ct. 372.

¶ 56 The *Adams* court further noted that although *Boyd* had been cited many times, it had been "distinguished in many of the cases from the state courts which we have had occasion to examine." *Id.* at 597, 24 S.Ct. 372. The court thus concluded that the states that had distinguished *Boyd* had acted

appropriately because the Fourth and Fifth Amendments were never intended to exclude evidence without regard to how it was obtained. *Id.* at 598, 24 S.Ct. 372. Instead, these amendments were to "protect against compulsory testimony from a defendant against himself in a criminal trial, and to punish wrongful invasion of the home of the citizen or the unwarranted seizure of his papers and property," not to exclude evidence "which has been obtained by such means, if it is otherwise competent." *Id.* at 598, 24 S.Ct. 372. Given the narrow limits of *Boyd,* that decision is hardly a basis for deeming the Utah framers to have contemplated an exclusionary remedy.

¶ 57 The drafting history of section 14 further undermines the conclusion that that provision would have been originally understood to incorporate an exclusionary rule. The Draft Constitution of 1882 contained search and seizure provisions "almost identical to the Fourth Amendment." Paul G. Cassell, *Search and Seizure and the Utah Constitution: The Irrelevance of the Antipolygamy Raids,* 1995 BYU L. REV. 1, 4. *Boyd* was not decided until 1886. Given this drafting history, and the fact that the universal common law made illegally seized evidence admissible, it seems likely that any choice to depart from the common law rule would have generated at least some debate at the time of section 14's adoption. Instead, the records of the 1895 convention show that "Section 14 was read and passed without amendment." 1 PROCEEDINGS OF THE UTAH CONSTITUTIONAL CONVENTION 319 (1898) (recounting proceedings on Mar. 25, 1895).

¶ 58 Thus, I see little ground for attributing to the framers of section 14 the view that evidence collected in violation of its terms would be deemed inadmissible in court. At a minimum, a careful analysis of that question is in order. When we do address the substance of the original meaning of section 14, we should reinstate the longstanding view

---

18. The concurring justices in *Boyd* agreed. Justice Miller, joined by Chief Justice Waite, believed there to be no search or seizure within the meaning of the Fourth Amendment. The concurring justices instead believed that the sanction

for failing to comply with the subpoena (that the allegations would be taken as true in the face of failure to produce the invoices) violated the Fifth Amendment. *Id.* at 639–41, 6 S.Ct. 524 (Miller, J., concurring).

that the Utah Constitution does not incorporate an independent exclusionary rule.

## II

¶ 59 In time, the exclusionary rule that was claimed in *Larocco* and adopted in *Thompson* could become so ingrained in our jurisprudence that its reconsideration would be difficult. Eventually, a defendant whose section 14 rights are infringed could plausibly contend that he reasonably relied on the availability of an exclusionary rule in Utah constitutional law, and that any repudiation of that rule would undermine his reasonable reliance interests. As our cases have rightly recognized, "[t]he doctrine of *stare decisis* is ingrained in our law and is entitled to serious consideration." *Austad v. Austad,* 2 Utah 2d 49, 269 P.2d 284, 290 (1954). "The reason underlying [this doctrine] is that people should know what their legal rights are as defined by judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat." *Id.*

¶ 60 We are not yet at the stage where the *Thompson* exclusionary rule is beyond our reconsideration. The reliance-based justification for *stare decisis* is not implicated where the precedent in question "abandon[ed] [a] long-established [previous] rule," "failed to cite [a previous] line of cases altogether," and adopted a standard that is ambiguous or unworkable. *State v. Menzies,* 889 P.2d 393, 399 (Utah 1994). Because the dimensions and scope of the Utah exclusionary rule have not yet been established, there is little ground for an argument that the rule is so settled that it is beyond reconsideration on reliance grounds. I would accordingly reconsider this issue here and overrule *Lar-*

*occo* and *Thompson* as contrary to the original meaning of the Utah constitution.

## III

¶ 61 I conclude with a response to Justice Nehring, who writes separately to express his "disapproval" of my decision to address the remedial question presented in this case. *Supra* ¶ 21. With due respect to my esteemed colleague, this *is* a case where the question of the proper remedy for violations of article I, section 14 is "properly before the Court." *Supra* ¶ 21. My views on that question are hardly "advisory," as some of Justice Nehring's authorities suggest. *Supra* ¶ 21 n. 2 (citing cases criticizing the rendering of an "advisory opinion"). Instead, the remedial question I address is simply an alternative basis for resolving the case that is before us, as Walker's state constitutional challenge to the decision below can properly be rejected either on the ground that there is no constitutional violation to begin with or on the alternative basis that the remedy for that violation is not exclusion.

¶ 62 It is certainly true that the court need not reach the remedial question whether the Utah Constitution contemplates an exclusionary rule. But that does not render this question "irrelevant" or my analysis of it somehow "advisory." This case presents two constitutional questions of equal dignity. Both issues were briefed and argued to the court, and our decision properly could turn on either one. If Justice Nehring's critique were accepted, either issue could be deemed irrelevant in that the resolution of one could obviate the need to reach the other. Yet the existence of two alternative grounds for a decision has never barred our analysis of both of them. We frequently consider and resolve alternative bases for our decisions.[19]

---

19. *See, e.g., State v. White,* 2011 UT 21, ¶ 34, 251 P.3d 820 (addressing nondispositive issue "outside the scope of the narrow certiorari question presented ... in order to provide guidance to the trial court on remand"); *State v. Jeffs,* 2010 UT 49, ¶ 39, 243 P.3d 1250 (examining claim which was "not dispositive ... in order to guide the trial court on remand"); *Berry v. Greater Park City Co.,* 2007 UT 87, ¶ 31, 171 P.3d 442 (addressing an "alternative ground[ ] upon which to affirm the district court's" determination); *Menzies v. Galetka,* 2006 UT 81, ¶¶ 78–100, 101–07,

150 P.3d 480 (granting relief from judgment to habeas corpus petitioner under rule 60(b)(6) of the Utah Rules of Civil Procedure both because counsel rendered ineffective assistance of counsel *and* because counsel committed gross negligence, either of which would have been dispositive alone); *IHC Health Servs., Inc. v. D & K Mgmt., Inc.,* 2003 UT 5, ¶ 10, 73 P.3d 320 (addressing nondispositive issue because "it may again arise on remand"); *State v. Dorsey,* 731 P.2d 1085, 1091–93 (Utah 1986) (Zimmerman, J.,

And properly so, particularly on issues as significant as the ones presented here.[20]

¶ 63 I see no defensible *a priori* basis for deeming one of these constitutional questions to have "priority" over the other or for treating them as "sequential." *Supra* ¶ 23. Justice Nehring casts the remedial question as superfluous on the ground that a finding of probable cause makes it unnecessary to decide "what the remedy would be if the search were conducted without probable cause." *Supra* ¶ 23. But the assertion that that makes the remedial question "second[ary]" or "merely hypothetical" is a boomerang: A finding that Walker has no exclusionary remedy for any underlying violation of article I, section 14 likewise makes it unnecessary to decide whether there would be a violation if there were an exclusionary rule. In that sense the ground on which the court decides

the case could be deemed "secondary" and its analysis of the probable cause question could be seen as "merely hypothetical."

¶ 64 Neither issue is logically primary and neither is addressed to the hypothetical. Both issues are before us, and it is within our discretion whether to decide one or the other or both of them. In fact, courts have often resolved suppression cases in the government's favor on the basis of the applicability of an exception to the exclusionary rule without even deciding whether the warrants at issue were supported by probable cause.[21] Such cases are resolved based on a lack of an available remedy, without addressing the existence of an underlying legal wrong. This sequencing is entirely appropriate,[22] and not derided for reversing the proper order of analysis.[23] My approach here is along the same lines.

concurring in the result) (exploring "an alternative ground for finding [a police] search lawful").

20. The parties' briefs in this case addressed the question I analyze here in extensive detail. And this important issue was the basis for our allowing *amicus* participation both in the briefing and at oral argument. It also appears to be the basis for certification of this case from the court of appeals. *See* Request for Certification, at 1–2 (requesting certification on the ground that the case presents the "novel issue" of whether the state exclusionary rule conceived in *Larocco* and *Thompson* provides broader protections to criminal defendants than its federal counterpart). In light of our important role in interpreting the Utah Constitution, *see State v. Tiedemann*, 2007 UT 49, ¶ 33, 162 P.3d 1106 (noting our "authority and obligation to interpret Utah's constitutional guarantees"), it seems more than appropriate to address this issue in a case that squarely presents it in extensive, careful briefing by the parties and their *amicus*, *see State v. Earl*, 716 P.2d 803, 806 (Utah 1986) ("It is imperative that Utah lawyers brief this Court on relevant state constitutional questions.").

21. *See, e.g., United States v. Leon*, 468 U.S. 897, 925, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding that courts may "reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith"); *United States v. Williams*, 416 Fed.Appx. 130, 131 (3d Cir. 2011) ("[S]ince the application of *Leon* is determinative, we need not decide if the warrants were supported by probable cause."); *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999) ("If the good-faith exception applies, we need not reach the question of probable cause.");

*see also State v. Marquardt*, 286 Wis.2d 204, 705 N.W.2d 878, 890 n. 13 (2005) (deeming determination of probable cause unnecessary because "the warrant was based on an affidavit containing indicia of probable cause sufficient" to trigger the exception to the exclusionary rule provided by *Leon* ).

22. *Cf. Rhodes v. Stewart*, 488 U.S. 1, 3–4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988) ("In all civil litigation, the judicial decree is not the end but the means. At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces—the payment of damages, or some specific performance, or the termination of some conduct. Redress is sought *through* the court, but *from* the defendant.... The real value of the judicial pronouncement—what makes it a proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff.*" (internal quotation marks omitted)); *Kirby v. U.S. Gov't, Dep't of Hous. & Urban Dev.*, 745 F.2d 204, 207 (3d Cir.1984) ("[I]t is entirely proper for a court to focus on its present ability to provide any meaningful remedy...."); *White v. Ark. Capital Corp./Diamond State Ventures*, 365 Ark. 200, 226 S.W.3d 825, 830 (2006) (a claim is "moot for lack of remedy ... when any judgment rendered would have no practical, legal effect upon a then-existing legal controversy").

23. In fact, some courts insist that the reverse approach—i.e. determining *first* whether an exclusionary remedy even applies before examining probable cause—favors the "[p]rinciples of judicial restraint" that Justice Nehring raises. *United States v. Craig*, 861 F.2d 818, 820 (5th

¶ 65 Thus, my opinion in this case is neither advisory nor unusual. If the court's majority may properly articulate alternative grounds for its decisions, any member of the court can and should feel free to express his independent views on issues presented to the court. Separate opinions properly advance "vigorous debate" that "improves the final product" of the court.[24] And while genuine unanimity of a collegial body can enhance the court's legitimacy, "what must ultimately sustain the court in public confidence is the character and independence of [its] judges."[25] When we write separately we memorialize "benchmark[s] against which the majority's reasoning can continue to be evaluated, and perhaps, in time, superseded."[26] For these and other reasons, I view a separate opinion as an essential contribution to a healthy appellate body, not a selfish "commentary on [my] preferred resolution of a set of facts different from those presented by this case." *Supra* ¶ 23.

¶ 66 Generally, I would agree with a final point raised by Justice Nehring—that it is usually appropriate to avoid reaching out to resolve a broad legal question when the case may be decided on a straightforward, narrow ground. *Supra* ¶ 20 n. 1 ("[C]ourts should generally resolve cases on the narrowest applicable grounds unless specific reasons exist for offering broader guidance." (quoting *Gallivan v. Walker*, 2002 UT 89, ¶ 97, 54 P.3d 1069 (Durham, C.J., concurring))). That principle is properly rooted in judicial conservatism or humility, and I accept it as an appropriate starting presumption. But as the *Gallivan* case indicates, the presumption is rebuttable in cases where "specific reasons exist for offering broader guidance," and such reasons seem to me to be amply presented here.

¶ 67 In my view, the preference for the limited use of judicial power cuts both ways in this case. On one hand, it could be said that a decision to reach out to overrule *Larocco* and *Thompson* would be an act of judicial immodesty. But if those decisions themselves resulted from just such an act (as I think they did for reasons explained above), then a decision to continue to enshrine them can hardly be said to advance the cause of judicial humility. A refusal to reconsider *Larocco* and *Thompson* results in the preservation of a judge-made rule that finds no basis in the original meaning of the constitutional text, and in that sense the approach that I advocate actually advances the goal of judicial humility advocated by Justice Nehring.

¶ 68 The problem is further complicated by another principle that is rooted in judicial humility—the doctrine of *stare decisis*. If we do not promptly reconsider the *Larocco–Thompson* position, it will eventually be considered settled law in this state, worthy of deference under the doctrine of *stare decisis* regardless of whether those cases were correctly decided. By articulating my views on this matter, I hope to preserve this court's ability to reconsider this important issue while giving proper heed to the important doctrine of *stare decisis*.

¶ 69 Thus, while I share Justice Nehring's commitment to the principle of judicial restraint, that principle seems to me to counsel in favor of our separate consideration in this case of the remedial question addressed in *Larocco* and *Thompson*. I respect my colleagues' right to disagree with my judgment on that question, and hope that Justice Nehring is right in concluding that the issue "will come before the court again," *supra* ¶ 25,

---

Cir.1988). The United States Court of Appeals for the Fifth Circuit, for example, "employ[s] a two-step process for reviewing a district court's denial of a motion to suppress when a search warrant is involved." *Cherna*, 184 F.3d at 407. First, the court "determine[s] whether the good-faith exception to the exclusionary rule announced in [*Leon* ] applies." *Id.* If it does, the court "end[s][its] analysis and affirm[s] the district court's decision to deny the motion to suppress" without "reach[ing] the question of probable cause." *Id.* If no exception to the exclusionary rule applies, then the court "pro-

ceed[s] to the second step, in which [it] ensure[s] that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* (alteration omitted) (internal quotation marks omitted).

24. William J. Brennan, Jr., *In Defense of Dissents*, 37 HASTINGS L.J. 427, 430 (1986).

25. CHARLES EVANS HUGHES, THE SUPREME COURT OF THE UNITED STATES 67 (1928).

26. Brennan, *supra* ¶ 65 n. 24, at 435.

before we deem ourselves foreclosed from an open reconsideration of this important question.